**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Manuel BOBADILLA–LOPEZ,**
**Defendant–Appellant.**

**No. 90–50455.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 1991.

Decided Jan. 9, 1992.

**520**

Peter A. Vance, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Timothy D. Coughlin, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before SCHROEDER and REINHARDT, Circuit Judges, and KING,* District Judge.

SCHROEDER, Circuit Judge:

Appellant Manuel Bobadilla–Lopez was convicted by a jury of drug trafficking offenses under 21 U.S.C. §§ 846 & 841(a)(1) and 18 U.S.C. § 2, and was sentenced to 60 months in prison. He now appeals his conviction. Bobadilla's primary claim is that tape-recorded radio transmissions of a border patrol agent observing him prior to his arrest constitute Jencks Act material. *See* 18 U.S.C. § 3500. The recordings were destroyed pursuant to agency policy thirty days after they were made. After holding a special hearing, the district court determined that the tape recordings were not Jencks Act material. The district court reasoned that the recordings were like rough surveillance notes and not a statement of a witness made in preparation for litigation as contemplated by the Act. *See, e.g., United States v. Bernard,* 623 F.2d 551, 557–58 (9th Cir.1979). Bobadilla now appeals, claiming that the recordings constitute Jencks Act material improperly destroyed and that his case should be remanded for a new trial with the border patrol agent's testimony stricken as a sanc-

tion for the government's destruction of the recording.

### Background

Border Patrol Agent Tim York was performing patrol duties just north of the United States–Mexico border on December 15, 1989, in the area of the All–American Canal and the Alamo River, east of Calexico. He received a radio report that sensors had detected motion on the Alamo River "check," a bridge-like structure used to regulate the flow of water from the river into the canal. Agent York moved his vehicle into a position to observe the check and with binoculars observed the appellant crossing back and forth between the Mexican and United States sides of the border carrying what appeared to be large garbage bags.

According to Agent York's testimony at trial, after seeing three bags apparently carried to the north side of the check, he observed Bobadilla and a female companion drive east. Agent York used his radio to broadcast some observations, to describe the vehicle they were driving and to request backup. Agent York followed the couple and observed them stop at a clump of trees and turn west, where they were stopped by agents. Bobadilla's companion, Marina Lara–Lara, told the agents they had been carrying bags and directed the agents to the clump of trees where three dark-colored garbage bags were found containing individually wrapped packages of marijuana. Both Bobadilla and Lara were arrested.

That recordings were made of Agent York's surveillance transmissions came to the district court's attention during the course of a pretrial hearing on a motion to suppress. The motion to suppress itself is not relevant to any issues on appeal. Agent York's testimony at the hearing, however, made it clear that he had broadcast messages to other patrol agents. Defense counsel sought to suppress the testimony of Agent York as a sanction for the

---

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

government's routine destruction of the tape. The district court, still prior to trial, held a hearing to determine whether or not the material was Jencks Act material and concluded that it was not.

During the course of that hearing, Agent York testified that his transmissions were sporadic and intended to describe the two suspects and their location. He testified that he was not aware that any tapes were made of the transmissions and he did not use the tapes in making his final report, which the government did produce.

The district court ruled the recordings were not Jencks Act material. The district court reasoned that the recordings were a form of rough surveillance notes and not "statements" as contemplated by the Act. *See United States v. Spencer*, 618 F.2d 605, 606–07 (9th Cir.1980) (rough, incomplete notes not Jencks Act statements); *United States v. Bernard*, 623 F.2d 551, 557–58 (9th Cir.1979) (same). The trial proceeded, Agent York testified and Bobadilla was convicted on both counts. This appeal followed.

*The Tapes as Jencks Act Material*

We deal for the first time in this circuit with the claim that recordings of investigative surveillance observations must be retained and turned over to defense counsel for impeachment purposes in the event the officer making the surveillance is called as a witness. Some history of the origin and purpose of the Jencks Act is therefore appropriate.

In *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), the Supreme Court held that a criminal defendant had a due process right to inspect, for impeachment purposes, statements which had been made to government agents by government witnesses. Such statements were to be turned over to the defense at the time of cross-examination if their contents related to the subject matter of the witness' direct testimony, and if a demand had been made for specific statements of the witness. 353 U.S. at 667–72, 77 S.Ct. at 1013–15.

The Jencks Act, 18 U.S.C. § 3500, was enacted in response to the *Jencks* decision. The Act was intended to preserve the defendant's right to obtain access to materials which would aid in impeaching government witnesses. *See* S.Rep. No. 981, 85th Cong., 1st Sess., *reprinted in* 1957 U.S.Code Cong. & Admin.News 1861, 1862. However, the legislative history expresses a much greater concern with limiting the application of the *Jencks* decision so that it would not hamper the workings of law enforcement by forcing wholesale disclosure of government materials and files. *Id.* As the Supreme Court stated in an early interpretation of the statute:

> Not only was it strongly feared that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process and thereby injure the national interest, but it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations. The committee reports of both Houses and the floor debates clearly manifest the intention to avoid these dangers by restricting production to those statements specifically defined in the bill.

*Palermo v. United States*, 360 U.S. 343, 350, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959) (footnote omitted).

The text of the Jencks Act provides that, after a government witness has testified on direct, "the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). If the government claims the statement is not relevant to the witness' testimony, the trial court must inspect the material *in camera*, and excise any irrelevant portions. 18 U.S.C. § 3500(c). If the government chooses not to produce material as ordered by the court, "the court shall strike from the

record the testimony of the witness." 18 U.S.C. § 3500(d).

Subsection (e) of the Act defines the term "statement" as:

(1) a written statement made by [a government] witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

■ Both the history of the statute and the decisions interpreting it have stressed that for production to be required, the materials should not only reflect the witness' own words, but should also be in the nature of a complete recital that eliminates the possibility of portions being selected out of context. For example, the Supreme Court in *Palermo v. United States,* 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959), stated that "the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital." Because the drafters did not intend to grant access to materials which take a witness' words out of context, courts have considered the nature and completeness of the alleged "statement." Thus in *United States v. Bernard,* 623 F.2d 551, 557–58 (9th Cir.1979), we held that an agent's rough notes jotted during surveillance were not producible under the Jencks Act due to the incomplete nature of the notes. We noted that "rough notes of an agent's surveillance activities are often sketchy and incomplete, made in a hurry, at different times, and will include the agent's own impressions and conclusions." *Id.* at 558; *see also United States v. Spencer,* 618 F.2d 605, 606–07 (9th Cir.1980) (notes are not Jencks Act statements "when the notes are not complete, are truncated in nature,

or have become an unsiftable mix of witness testimony, investigators' selections, interpretations, and interpolations"); *United States v. Lane,* 574 F.2d 1019, 1022 (10th Cir.) (declining to require preservation and production of all investigative notes), *cert. denied,* 439 U.S. 867, 99 S.Ct. 193, 58 L.Ed.2d 177 (1978).

■ We believe the danger of distortion and incompleteness is especially relevant in this case. The border patrol agent's radio transmissions share the same rough, incomplete nature as notes hurriedly jotted during surveillance. *See Bernard,* 623 F.2d at 557–58; *Spencer,* 618 F.2d at 606–07; *see also United States v. Goldberg,* 582 F.2d 483, 487–88 & n. 2 (9th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979). They were never intended to provide a complete description of events that could serve as a basis for impeachment.

Bobadilla seeks to distinguish this case from cases involving surveillance notes on the ground that this surveillance transmission was intended to communicate information to others. He relies upon our decision in *United States v. Carrasco,* 537 F.2d 372 (9th Cir.1976), in which we held that a diary kept by a government informant about ongoing drug transactions was Jencks Act material. In *Carrasco,* the diary became a Jencks Act statement only when the author turned the pages over to a DEA agent for use as evidence. *Id.* at 375. The diary consisted of daily entries documenting the events leading up to the narcotics transaction and were signed or initialled on each page by the author as an accurate statement. In contrast, the spotty, impressionistic and incomplete on-site transmissions of the agent in this case do not amount to the same kind of narrative "statement" of a witness producible under the Jencks Act.

■ This court has consistently recognized a clear distinction between investigative interviews with witnesses that are intended to form the basis for evidence at trial, on the one hand, and surveillance observations on the other. Records of witness interviews are Jencks Act statements.

Records of surveillance activities are not Jencks Act statements, even though they may be communicated to another agent. The distinction is illustrated by our decision in *U.S. v. Andersson,* 813 F.2d 1450, 1459 (9th Cir.1987) where we held that a list of sites visited by suspects under surveillance, a list which was handed over to another agent but subsequently lost, was not a Jencks Act statement required to be preserved in the event the surveillance agent testified. In contrast is our decision in *United States v. Well,* 572 F.2d 1383 (9th Cir.1978), which held that recorded interviews with potential witnesses were Jencks Act statements and had to be preserved. The agent's surveillance transmissions in this case did not become "statements" under section 3500(e)(2) simply because they were recorded. Neither this court nor any other court has held that by recording conversations between its agents, the government transforms the conversations into potential Jencks Act "statements." Yet that is what the dissent incorrectly declares the law to be.

We emphasize our holding is a narrow one. The recordings involved here may well have been discoverable pursuant to Fed.R.Crim.P. 16(a). In this case, however, no request for the material was made until after its routine destruction thirty days after the surveillance occurred. Indeed, at the time of the request, defense counsel was aware that the tapes had been destroyed. It is apparent that the purpose of the production request in this case was never to use the tape for impeachment purposes, but to prevent the agent who made the recording from being able to testify as to his observations on the day in question. The Jencks Act is not an appropriate tool for achieving that end.

### Appellant's Other Contentions

 Bobadilla raises two additional issues on appeal which we address briefly. First, Bobadilla claims that the district court improperly gave a *Jewell* instruction. A *Jewell* instruction allows the jury to find the requisite knowledge where a defendant actually knows of facts indicating he is committing a crime and deliberately avoids learning the truth. *United States v. Jewell,* 532 F.2d 697, 698–99 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). Such an instruction is appropriate where the surrounding circumstances "would have put any reasonable person on notice that there was a 'high probability' that the undisclosed venture was illegal." *United States v. Nicholson,* 677 F.2d 706, 710 (9th Cir. 1982). Here there was evidence from which the jury could infer Bobadilla's deliberate ignorance: testimony established that the garbage bags gave off a strong odor of marijuana, that one of the bags was ripped, revealing the wrapped packages, and that the appellant was suspicious and thought the bags might contain drugs. We therefore conclude that the district court did not err in giving a *Jewell* instruction.

 Bobadilla also contends that the district court erred in refusing to give a lesser-included offense jury instruction for simple possession of marijuana. To obtain such a lesser-included offense instruction, a defendant must identify the lesser-included offense and show that a rational trier of fact could convict on the lesser offense but acquit on the greater. *United States v. Brown,* 761 F.2d 1272, 1277 (9th Cir.1985). The district court properly found that a jury could not rationally find Bobadilla guilty of possession for personal use due to the large quantity of marijuana, its packaging, and Bobadilla's own statements that he agreed to deliver the bags to Calexico for an amount of money.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

Even the most talented lexicologist would have an exceedingly difficult task if asked to explain why the term "statement" does not include a verbal message communicated from one border patrol agent to another. That task would be even more difficult if the verbal transmissions were recorded on tape and the word "statement" were defined explicitly to include "a stenographic, mechanical, electrical, or other recording ... which is a substantially verba-

tim recital of an oral statement."[1] The majority today nevertheless holds that a verbatim tape-recording of an oral radio transmission in which one border patrol agent reports his observations of alleged criminal activity to others does not contain a "statement" as that term is used in the Jencks Act, 18 U.S.C. 3500. This remarkable interpretation of the Jencks Act contradicts the plain meaning of the text of that statute, frustrates the purpose of the law, conflicts with precedent, and needlessly raises the issue of the constitutionality of the government's destruction of potentially exculpatory evidence. I dissent.

## I.

### A.

The determination of whether recorded oral communications from one border patrol agent to other agents are "statements" as that term is used in the Jencks Act must be made in accordance with normal rules of statutory construction. In order to accomplish this task, a brief examination of the genesis of the Act is helpful. As the majority correctly notes, the Jencks Act was adopted in response to the United States Supreme Court's decision in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). In *Jencks*, the Supreme Court recognized the government's constitutional obligation to permit criminal defendants to inspect statements in the possession of the government which the defense might be able to use to impeach the testimony of government witnesses at trial. *See Jencks*, 353 U.S. at 667–72, 77 S.Ct. at 1013–15. *Jencks* held that this requirement was an essential element of due process. Subsequent cases have indi-

cated that production of these types of statements also may be required by the Sixth Amendment. *See United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969) ("It may be that in some situations, denial of production of a Jencks Act type of a statement might be a denial of a Sixth Amendment right."); *United States v. Wallace*, 848 F.2d 1464, 1471 (9th Cir.1988) ("[U]nproduced Jencks material may well implicate confrontation clause or compulsory process issues.").

Statutory enactments, of course, cannot overrule constitutional mandates. Thus, the majority's statement that the Jencks Act was passed in order to "limit[ ] the application of the *Jencks* decision," opinion at 521, is somewhat misleading. The Jencks Act instead was meant to codify *Jencks* and thereby reduce potential misunderstandings regarding the scope of the decision. *See, e.g., Goldberg v. United States*, 425 U.S. 94, 104–05, 96 S.Ct. 1338, 1344–45, 47 L.Ed.2d 603 (1976). Indeed, the Court has noted explicitly that the legislative history of the Jencks Act indicates clearly that the statute "was not intended to limit the *Jencks* decision," and instead "reaffirms" the Supreme Court's ruling in that case. *Id.* 425 U.S. at 104, 96 S.Ct. at 1345 (citing and quoting from numerous legislative sources).

The constitutional basis of the statutory provisions in the Jencks Act militates strongly against the majority's constricted interpretation of that statute. Normal rules of statutory construction are clear, and include the requirement that a statute should be construed expansively if a narrow interpretation of that statute raises unnecessary constitutional issues.[2]

---

**1.** Jencks Act, 18 U.S.C. § 3500(e)(2).

**2.** *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 692–93, 99 S.Ct. 2545, 2552–53, 61 L.Ed.2d 176 (1979); *Schor v. Commodity Futures Trading Commission*, 740 F.2d 1262, 1278 (D.C.Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985) ("In the absence of a clear expression of legislative will, we adopt the construction of the Act that avoids significant constitutional questions."). Because the scope of the Jencks Act is not coextensive with the requirements of the due process clause and the

Sixth Amendment, Bobadilla–Lopez might, given the Supreme Court's decisions in *Jencks* and *Augenblick*, have a constitutional right to production of the tape recording of Agent York's radio transmissions even if that tape does not contain a "statement" as that term is used in the Jencks Act. Because the Jencks Act clearly mandates the production of Agent York's recorded oral communications, however, I find it unnecessary to reach the difficult constitutional issue concerning the scope of *Jencks* and *Augenblick*.

## B.

Even absent the broad reading of the Jencks Act required by the Act's constitutional foundations, the recorded oral communications made by Agent York over the radio to other border patrol agents unquestionably would be subject to production under any reasonable reading of the plain language of the Act. The Act requires the government to permit criminal defendants to inspect "any statement of the witness [who testifies for the government at trial] that is in [the government's] possession and that relates to the subject matter concerning which the witness has testified." 18 U.S.C. § 3500(a). It is undisputed that Agent York was a witness for the government, that his radio communications to other border patrol agents while observing Bobadilla–Lopez related to the subject matter concerning which Agent York testified, and that a tape recording of these communications was (prior to its destruction) in the possession of the government.

The only possible issue, then, is whether or not Agent York's oral radio transmissions are "statements" as that term is used in the Jencks Act. The Jencks Act explicitly defined the term "statement":

(e) The term "statement", as used in ... this section in relation to any witness called by the United States means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously

with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury. 18 U.S.C. § 3500.

The tape recording of Agent York's radio communications clearly is a "statement" as that term is defined in 18 U.S.C. § 3500(e)(2). There is no doubt that the tape made by the government constitutes a "recording." The tape also unquestionably contains a "substantially verbatim recital"—indeed, a *completely* verbatim recital—of Agent York's communications. Similarly, there is no doubt that Agent York's communications constitute an "oral statement" [3] made by a witness for the government.[4] Finally, it is undisputed that this tape was "recorded contemporaneously" with Agent York's statements. The plain language of the Jencks Act thus clearly demonstrates that the tape which recorded Agent York's oral radio transmissions to other border patrol agents contained "statements" by Agent York and hence was subject to production under the Act.

## C.

Given the clear meaning of the terms used in the Jencks Act as applied to the material at issue in the present case, the majority's conclusion that the material is not subject to production under the statute is puzzling. Despite the fact that the term "statement" is explicitly defined in 18 U.S.C. § 3500(e), and despite the fact that the plain meaning of such a statutory definition generally is conclusive,[5] the majority bases its decision *not* upon the text of the Jencks Act, but rather upon strained analo-

---

**3.** By using the words "oral statement" in its definition of the term "statement," Congress violated Noah Webster's cardinal rule against using the term to be defined in the definition of that term. Fortunately, the fact that Agent York's verbal communications with other border patrol agents clearly are "oral statements" as those words are commonly understood moots Congress' lexical deficiency.

**4.** Because the government destroyed the tape which recorded Agent York's communications, the exact content of the radio transmissions

from Agent York to other border patrol agents is unknown. However, even the most perfunctory of Agent York's imaginable communications—e.g., "The suspect is turning left," "I've lost sight of the car," or "The suspect is driving a red pickup truck"—clearly entail "oral statements."

**5.** *See, e.g., United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240–42, 109 S.Ct. 1026, 1029–31, 103 L.Ed.2d 290 (1989); *Fernandez v. Brock,* 840 F.2d 622, 632 (9th Cir.1988).

gies to wholly inapplicable cases involving a different subsection of the Act and entirely different circumstances than are involved here. Remarkably, except for the mere quotation of 18 U.S.C. § 3500(e), the majority does not even *discuss* Congress' explicit definition of a Jencks Act "statement," nor does it ever attempt to explain why the express language of 18 U.S.C. § 3500(e)(2) does not clearly preclude a finding that Agent York's radio transmissions are not "statements." Instead, the majority in this case creates an exception to the Jencks Act for a particular type of statement which *it* believes the government should not be required to produce.

## II.

## A.

The majority declares *ex cathedra* that all statements of government investigators regarding their investigations are exempt from discovery. That no such sweeping exception can be twisted out of the statutory language, that there is no basis for the majority's view in the legislative history, and that Ninth Circuit precedent does not support the majority's construction of the Jencks Act appears to be of little concern to my colleagues. Instead, they are satisfied to base their unique, judicially-created exception exclusively on loose analogies to earlier but irrelevant cases. Each of these cases involves either (1) a government agent's *rough notes* concerning an investigation or surveillance operation he has performed, or (2) a government's agent's brief written *summary* of an extensive interview of another person. None of the cases relied upon by the majority involve a *recorded oral* statement—let alone a *verbatim* recorded oral statement—made by a government agent to a third person, regardless of the subject matter.

First, the majority cites *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), in justification of its inordinately restrictive view of the scope of the Jencks Act. *Palermo* is a "summary" case; it clearly involved an entirely different issue than the one presented here. In

*Palermo*, the Court affirmed the lower court's refusal to order production of a government agent's 600–word summary of his three-and-a-half-hour conference with a government witness. The Court held that it was "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' *own* rather than the product of the investigator's selections, interpretations, and interpolations." *Palermo*, 360 U.S. at 350, 79 S.Ct. at 1223 (emphasis added). *Palermo* illuminates the problem with summaries or rough notes, *made by a third party*, of a witness' utterances. By contrast, the present case concerns a direct transcription of Agent York's oral statements and hence involves none of the problems associated with the type of third-party summary at issue in *Palermo*. The concerns of *Palermo* are completely inapplicable to the present case: there is no doubt that the tape of Agent York's radio transmissions literally recorded *Agent York's own words* and not the "selections, interpretations, and interpolations" of a third party. The tape recording of Agent York's own statements obviously does not involve the problem of third-party "distortion" discussed in *Palermo*. Cf. *United States v. Griffin*, 659 F.2d 932, 937 (9th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982) ("Whether original notes can be considered 'statements' under the Jencks Act depends, first, on *whose* statement allegedly is contained therein; that is, against whose testimony at trial they could be used as impeachment material.") (emphasis in original). In short, *Palermo* offers no support whatsoever for the majority's claim that production of the *tape* of Agent York's *verbatim statements* to other border patrol agents is not required by the Jencks Act.

The majority next attempts to distance itself from the command of the text of the Jencks Act by citing cases which involve government agents' rough surveillance or investigatory notes. These "rough notes" cases include *United States v. Andersson*, 813 F.2d 1450 (9th Cir.1987); *United States v. Spencer*, 618 F.2d 605 (9th Cir.1980),

*United States v. Bernard,* 623 F.2d 551 (9th Cir.1979), and *United States v. Lane,* 574 F.2d 1019 (10th Cir.), *cert. denied,* 439 U.S. 867, 99 S.Ct. 193, 58 L.Ed.2d 177 (1978). Each of these cases held that the requirements of the Jencks Act do not apply to rough notes regarding a government agent's surveillance or investigatory work—notes made for the agent's own use in refreshing his memory when preparing a final written report (which the defendant would be entitled, under the Jencks Act, to obtain). *See Andersson,* 813 F.2d at 1459;[6] *Spencer,* 618 F.2d at 605–07; *Bernard,* 623 F.2d at 557–58; *Lane,* 574 F.2d at 1022.[7]

### B.

The holdings in the rough notes cases cited by the majority are light-years apart from the issue involved here. The majority completely fails to recognize that all of the case it relied upon construe a different subsection of the Jencks Act that the one involved in the case before us. *Andersson, Spencer, Bernard,* and *Lane* involve 18 U.S.C. § 3500(e)(1),[8] while the present case involves (e)(2)—a subsection which gives a wholly different definition of the term "statement" than is found in (e)(1).[9] Agent York's statements were not subsection (1) statements—they were not *written* statements at all. Instead, they were subsection (2) statements—recorded oral statements. A recording or writing is a "statement" if it meets *either* of the definitions set forth in section (e): in other words, it is sufficient that an item comply with either (e)(1) *or* (e)(2). Cases which interpret subsection (1) (which applies solely to *written* statements) are of little if any significance in cases in which the question is the proper construction of subsection (2). To put it more precisely, subsection (e)(1) cases are inapplicable when the transcription at issue is a contemporaneous mechanical recording of an oral transmission.

The courts in the cases relied on by the majority refused to order production of rough investigatory notes under subsection (1) in large part because the notes contained material meant only to "jog" the writer's memory and hence were subject to misinterpretation by third parties. In the present case, however, Agent York's statements were of an entirely different order.[10]

---

**6.** The majority's summary of our decision in *Andersson, see* opinion at 523, is incomplete. In *Andersson,* a government agent made rough surveillance notes of a suspect's activities. The agent then wrote a final written report which incorporated his rough notes, and this final report was turned over to the defendant. *See Andersson,* 813 F.2d at 1459. The fact that the rough notes were given to another government agent, who did not utilize them in preparing his own report, was irrelevant to our decision in *Andersson.*

**7.** *Lane* is weak authority indeed. The Tenth Circuit in that case acknowledged that the rule it affirmed "has been severely criticized by both the Ninth and D.C. Circuits." *Lane,* 574 F.2d at 1022. Also, the defendant in *Lane* did not raise his Jencks Act claim in the district court, and instead raised the issue only on appeal (and then only through a supplement to his appellate brief). Finally, the decision in *Lane* was based largely on factors unique to that case. *See id.* ("The notes are not written contemporaneously but hours, even days, later.").

**8.** *See Spencer,* 618 F.2d at 606; *Bernard,* 623 F.2d at 557; *see also Andersson,* 813 F.2d at 1149 (noting that the rough notes in that case "fall within the *Bernard* rule"). The definition of "statement" contained in 18 U.S.C. 3500(e)(1) is "a written statement made by said witness and signed or otherwise adopted or approved by him."

**9.** The majority also refers to *United States v. Goldberg,* 582 F.2d 483 (9th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979), in a string cite. *See* Opinion at 522. *Goldberg* is inapplicable to the current case for the same reason as *Andersson, Spencer, Bernard,* and *Lane.* *See Goldberg,* 582 F.2d at 487 n. 2 (noting explicitly that the case did not involve subsection (e)(2)). *Goldberg,* like *Palermo,* also is inapplicable because the materials demanded in that case were incomplete notes taken by a non-witness government agent of the testimony of a government witness. *See id.* (refusing to order production because the statements contained in the government agent's notes could not "'fairly be said to be the witness' own.'") (quoting *Palermo* ).

**10.** An order compelling production of such potentially misleading information was especially unnecessary in the cases cited by the majority because the defendant would have had access under the Act to the final report which incorporated the rough notes. As the majority admits, however, Agent York did not examine or utilize the statements contained on the tape when he

They were not made for his own use in order to "jog his memory," but instead were *oral* statements made for the purpose of communicating with others and were contemporaneously recorded by mechanical means; thus, they fell squarely within the provisions of subsection (e)(2) of the Jencks Act.

There is a world of difference between the accuracy and impeachment value of, on the one hand, rough personal notes concerning an investigation made by a government agent *for his own individual use* and, on the other hand, a verbatim mechanical recording of a government witness' oral communications to a third party made while observing a suspect commit a crime and intended to serve as the basis for a third party's actions. *Andersson, Bernard, Spencer,* and *Lane* thus are entirely distinguishable from the current case and can in no way overcome the clear mandate of the text of the Jencks Act.

### C.

My colleagues claim that we have "consistently recognized a clear distinction between investigative interviews with witnesses ... and surveillance observations," opinion at 522, and derive from this distinction the bold conclusion that although records of witness interviews are Jencks Act statements, records of surveillance activities do not constitute statements subject to production under the Act even if those statements are communicated to other government agents. The majority's "clear distinction," however, fails to explain our result in a number of previous cases in which we have upheld the production of surveillance records under the Jencks Act. For example, our decision in *United States v. Carrasco,* 537 F.2d 372 (9th Cir.1976), clearly belies the "clear distinction" between records of surveillance activities and records of witness interviews. In *Carrasco,* a government agent named Gamez made daily entries in a diary which described her observations of her interactions with particular criminal suspects; she subsequently turned these surveillance notes

over to a government agent named Gonzales. We held in *Carrasco* that Gamez's surveillance notes were "clearly" Jencks Act statements. *Id.* at 375. We also noted in that case that "[w]hatever the diary [containing the surveillance notes] was before Gamez gave it to Gonzales, it became a statement, as that word is commonly used, once she gave it to him.... By giving her diary to Gonzales, Gamez transformed what had been a diary not covered by the Jencks Act into a statement which was." *Id.* The majority's "clear distinction" is thus squarely contrary to our decision in *Carrasco* as well as to our statements in a number of other cases. *See, e.g., United States v. Bibbero,* 749 F.2d 581, 585 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985) ("There are *no exceptions* to the Jencks rule that all statements relevant to the subject matter of the witness' testimony must be produced after direct examination of the witness.") (emphasis added); *Harris,* 543 F.2d at 1250 ("This Circuit recently reaffirmed the view that notes *and* reports of government agents made in the course of a criminal *investigation* may be subject to production under the Jencks Act if the agent testifies at trial.") (emphases added).

### D.

The majority cites only *Andersson* to support its assertion of a "clear distinction" between the application of the Jencks Act to records of surveillance observations as opposed to records of witness interviews. *See* Opinion at 522. However, as noted above, *see supra* at 522–25, *Andersson* and its "rough notes" predecessors are completely inapplicable to the present case. The "clear distinction" relied upon by the majority—if it exists at all, *see supra* at 525—relates only to the production under *subsection (e)(1)* of *written rough investigatory notes* made by a government agent for his *personal* use. That "clear distinction" has no relevance whatsoever to the production of a *verbatim recording* of a government agent's *verbal statements* to

made his final written report. *See* Opinion at 521.

*other agents* under *subsection (e)(2)* of the Jencks Act. The majority's conclusion that "[r]ecords of surveillance activities are not Jencks Act statements, even though they may be communicated to another agent," opinion at 522, thus is wholly unsupportable.[11] The majority's conclusion is contradicted by the plain language of the Jencks Act, conflicts with Ninth Circuit precedent, and has been squarely rejected by several other circuits as well. *See, e.g., United States v. Welch,* 810 F.2d 485, 490 (5th Cir.), *cert. denied,* 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987) ("The district court apparently was persuaded that an agent's investigation report never can be a Jencks Act statement when the agent himself is the witness.... [However], investigation reports *can* be an agent's 'statement' required to be produced under the Jencks Act.") (emphasis in original); *United States v. Sorrentino,* 726 F.2d 876, 887–88 (1st Cir.1984) ("Walsh had prepared a 'special agent's report' summarizing his pretrial investigation.... The report is clearly a 'statement' under [the Jencks Act].").

The majority admits that *United States v. Well,* 572 F.2d 1383 (9th Cir.1978) (per curiam), is "in contrast" to *Andersson,* but asserts that *Well* is of no relevance to the present case. *See* Opinion at 523. However, the present case is *far* more similar to *Well* than to any case relied on by the majority. In *Well,* government agents made tape recordings of their conversations with several government witnesses who testified at trial—much like the government in the present case made tape recordings of the conversations between Agent York (a government witness) and other border patrol agents. The tape recordings in *Well,* like those in the present case, subsequently were destroyed pursuant to "routine government procedure." The extent to which the majority's opinion distorts prior Jencks Act cases is indicated by the wide divergence between the result

here and the result in *Well.* In *Well,* the government was forced to *concede* the fact that the tape recordings were Jencks Act material, and the court required only a *per curiam* opinion to affirm the suppression of all testimony by witnesses who had been involved in tape-recorded interviews. *See id.* at 1384. The majority in the present case, on the other hand, concludes—without any analysis of the plain meaning of the text of the Jencks Act—that the statute does not apply to a tape recording of a critical communication between government agents regarding the very occurrence of the criminal conduct in dispute.

### E.

A crucial difference between the cases cited by the majority and the present case (in addition to the fact that the majority's cases do not involve oral communications at all, and thus are governed by an entirely different subsection of the Jencks Act) is the presence of an *intent to communicate* on the part of Agent York. Communication to others was the fundamental purpose of Agent York's oral radio transmissions, and that intent to communicate distinguishes the present case from the "rough surveillance notes" rule advanced by the majority. *United States v. Carrasco,* 537 F.2d 372 (9th Cir.1976), explicitly relied on this distinction, stating that "[a] statement, unlike notes or a diary, seeks to *transmit information ...*" *Id.* at 375 (emphasis added). There is no question that Agent York's radio transmissions were meant to transmit information from Agent York to third parties (other border patrol agents) and hence are "statements" as that term is defined in *Carrasco.* As far as I am aware, we are still bound by that case.

### III.

The majority does not dispute the distinction drawn by *Carrasco* between communications intended to convey information and

---

**11.** Indeed, the majority's purported "distinction" makes little sense: nowhere does the majority explain why verbatim recordings of a government witness' statements are Jencks Act material *only* if the witness is not a government agent.

A tape recording of the statement "I saw a white female purchase cocaine" may be crucial evidence regardless of whether the witness who uttered those words was a government agent or a third-party observer.

rough notes intended for a government agent's personal use; instead, it seeks to escape the force of *Carrasco* by asserting that *Carrasco* does not apply when communicated statements are "spotty, impressionistic and incomplete." Opinion at 523. The majority's effort to limit *Carrasco* fails for several reasons.

First, there simply is *no* language in *Carrasco* that suggests that the Act requires production only of communicated statements in which the witness describes unfailingly every major and minor ramification relating to the incident in question or regurgitates every sensory observation that his faculties record. Nor is there any precedent that even hints at the existence of a "spotty, impressionistic, and incomplete" exception to communicated statements.[12] The majority simply has created its exception out of thin air.

Second, the majority's attempt to add a "spotty, impressionistic, and incomplete" exception to *Carrasco* is directly contrary to the purpose and intent of that case. *Carrasco* stands for the proposition that when a statement is made with the intent to *communicate* to others, that statement is inherently the type of statement subject to production under the Jencks Act. Statements intended to impart information to others are generally made in a manner designed to communicate accurately the information required by the receiver to interpret and act on the statement. The "distortion" which might be present if selective passages of a government agent's personal rough notes intended for his own use were turned over to a defendant does not exist

where, as here, the recorded statement was made with an intent to communicate information in an accurate manner and the contemporaneous recording contains a verbatim recital of that statement. There is no rational justification for an exception similar to a rough notes exception in the case of communicated statements.

Third, there is simply no indication whatsoever in *Carrasco* that the observations set forth in the diary entries in that case were any less "spotty, impressionistic and incomplete" than the radio transmissions involved in the present case; indeed, given the nature of such diary entries, there is good reason to believe that the material which *Carrasco* ordered to be produced was *more* "spotty, impressionistic and incomplete" than the material at issue here. Under the text of the Jencks Act, transcriptions are "incomplete" and hence exempt from production only if they are not "substantially verbatim" transcriptions of statements of a government witness. No one suggests that the tape recording of Agent York's statements in the present case is not a "substantially verbatim" recording of these statements.

Finally, *Carrasco* explicitly held that even materials initially *not* subject to production under the Jencks Act are *transformed* into Jencks Act statements once they are transferred from one government agent to another *with the intent to communicate. See Carrasco*, 537 F.2d at 375 ("Whatever the diary was before Gamez gave it to Gonzales, it became a statement, as that word is commonly used, once she gave it to him.... By giving her diary to

---

**12.** The majority quotes from *Palermo* to support its conclusion that the Jencks Act mandates production only of "complete" statements "that eliminate[ ] the possibility of portions being selected out of context." Opinion at 522. This reference in *Palermo*, however, relates to an entirely different matter than that suggested by the majority. The *Palermo* Court was concerned that a government agent's summary of a witness' statements would be used to impeach the witness even though the summary necessarily would have included some of the witness' statements but have omitted or ignored others. The sentences prior to the sentence fragment quoted by the majority make clear that the Court was concerned only about distortion when one person's notes are used to impeach the testimony of a *different* person. *See Palermo*, 360 U.S. at 352, 79 S.Ct. at 1224 ("It is clear that Congress was concerned that only those statements which could properly be called *the witness' own words* should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion *what had been said to the government agent*.") (emphasis added). This concern is entirely inappropriate here, where Agent York's statements would be used to impeach Agent York himself and where the recording contains Agent York's own *verbatim* statements.

Gonzales, Gamez transformed what had been a diary not covered by the Jencks Act into a statement which was.").[13] Thus, even if Agent York's statements had been "spotty, impressionistic, and incomplete," and even if statements of that nature ordinarily would not be subject to production under the Act, Agent York's statements *became* Jencks Act statements once they were communicated to other government agents. The majority's attempt to import the "rough notes" or "spotty, impressionistic, and incomplete" concept into the framework of a recorded oral communication intended to provide reliable information to a third party is flatly inconsistent with *Carrasco*.

Whether or not Agent York's narrative encompassed *everything* he saw, his statements were intended to convey information that was sufficiently *accurate* and *comprehensible* to permit third parties to act, including the taking of actions which would lead to the arrest of a criminal suspect and thus to the restriction of an individual's fundamental liberty. An evaluation of Agent York's statements at trial by third parties (jurors) would not "distort" the meaning of those statements because he made them with full awareness that they were being transmitted to third parties who would be required to comprehend them. Because Agent York's radio transmissions were intended to communicate important information to others and were contemporaneously recorded verbatim, they constitute statements subject to production under subsection (e)(2) of the Jencks Act. *Carrasco* and the Act itself permit no other result.

## IV.

The tape recording of Agent York's statements to other border patrol agents is precisely the type of material which the Sixth Amendment and the Jencks Act contemplate be produced. The production requirements of the Constitution and the Act are based primarily on the value to the defense of material in the possession of the government which the defense might use to impeach a government witness. *See Jencks*, 353 U.S. at 667, 77 S.Ct. at 1012. The tape recording of Agent York's statements to other border patrol agents could well have been critical to the defendant's attempt to impeach Agent York, who was the sole government witness at Bobadilla–Lopez's suppression hearing and a crucial government witness at trial. The tape contained verbatim statements made by Agent York—statements which described his observations of Bobadilla–Lopez while he was engaged in the very conduct that formed the basis for his conviction. The statements were intended to impart vital and accurate information to other government agents and, unlike the material exempted from disclosure in the cases cited by the majority, the tapes "contained a more accurate account or recordation than the material eventually disclosed." *United States v. Bagnariol*, 665 F.2d 877, 890 (9th Cir. 1981).

The circumstances of Agent York's communications imbue these statements with a high level of reliability: Agent York knew that his statements would serve as the basis for important governmental action. In addition, his recollection at the time he made the statements was fresh, and free of the suggestive contamination of future events such as the discovery of marijuana in Bobadilla–Lopez's car or the pressure of testifying in an adversary proceeding where the propriety of his actions was be-

---

**13.** *Carrasco* is no way relied upon—and did not even find—that the diary was "complete" as the basis for its conclusion that the Jencks Act required the government to produce this diary. Rather, as noted, supra, *Carrasco* makes clear that the diary was transformed into a Jencks Act statement by the sole act of deliverance to a third party with the intent to communicate. If *Carrasco* itself was not clear enough, the explanation set forth in *Griffin* should have removed any doubt regarding the inapplicability of the

"rough notes" concept to cases involving statements made with an intent to communicate. *See Griffin*, 659 F.2d at 938 n. 4 ("Thus, it will be the very unusual case where an agent's own thoughts will be recorded in rough interview notes with sufficient completeness *or* intent to communicate to be a Jencks Act statement. In the more typical case, only the formal interview report, *through which the agent intends to communicate to others*, will be a 'statement' under the Jencks Act.") (emphases added).

ing challenged. By the time Agent York testified at Bobadilla–Lopez's trial, his memory undoubtedly had faded somewhat, his recollection of events may have been altered by subsequent events, and there was a natural temptation, when a question might be answered in different ways, to shade the answer in a manner that would lead to the conviction of the individual for whose arrest he had been responsible. Contrary to the assertions of the majority, the admission of Agent York's contemporaneous statements to other border patrol agents would do everything *but* "distort" the evidence presented at the suppression hearing and at trial. Instead, the tape contained the *most* reliable evidence of what Agent York actually saw—or believed that he saw—at the time he saw it. The tape of Agent York's contemporaneous communicative statements to other border patrol agents—the tape of a government agent's observations of a crime in progress—is precisely the type of material which the Jencks Act, the due process clause, and the Sixth Amendment require the government to produce.

### V.

The Jencks Act provides that if the government fails to produce Jencks Act statements of a government witness, "the court shall strike from the record the testimony of the witness." 18 U.S.C. § 3500(d). The due process clause and the Sixth Amendment similarly require the reversal of a conviction if a defendant is not permitted to inspect *Jencks* material. *See Jencks,* 353 U.S. at 668–72, 77 S.Ct. at 1013–15. We have held previously that imposition of sanctions under the Jencks Act generally is discretionary.[14] The proper exercise of this discretion depends on (1) the degree of the

government's culpability for the loss of the material, and (2) the prejudice that results to the defendant. *See United States v. Echeverry,* 759 F.2d 1451, 1456 (9th Cir. 1985).

Bobadilla–Lopez clearly was prejudiced immensely by the government's destruction of the tape containing statements made by Agent York to other border patrol agents. Agent York was the government's *sole* witness at Bobadilla–Lopez's suppression hearing,[15] and was a key witness at his trial. Agent York's testimony was the sole basis for the court's denial of Bobadilla–Lopez's motion to suppress the drugs: this evidence (as well as Agent York's testimony at trial) undoubtedly was a crucial factor in the jury's verdict. The credibility of Agent York's testimony during the suppression hearing and at trial thus was the key issue. The tape contained the most reliable evidence—and the only contemporaneous evidence—of what Agent York actually observed. The destruction of the tape containing Agent York's statements to other border patrol agents clearly prejudiced Bobadilla–Lopez's ability to impeach Agent York's testimony and thus defend himself. As the Supreme Court noted in *Jencks,* "[e]very experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory." *Jencks,* 353 U.S. at 667, 77 S.Ct. at 1012. The tape easily could have recorded statements that would have impeached or flatly contradicted Agent York's testimony at both the suppression hearing and at trial—only the government's destruction of the tape precludes full knowledge of just what type of damaging material it contained.

**14.** Reversal of a conviction for violation of the due process clause or the Sixth Amendment, of course, is not discretionary. However, because I would hold that Agent York's testimony should have been suppressed under the clear mandate of the Jencks Act, I need not reach the issue of what remedy would be required in the present case for violation of the constitutional standards established by *Jencks* and its progeny.

**15.** We previously had held that the Jencks Act, which requires the government to produce a

government witness' statements after he "has testified on direct examination," did not apply to suppression hearings. *See, e.g., United States v. Bernard,* 623 F.2d 551, 555–56 (9th Cir.1979). In 1983, however, Congress passed Fed.R.Cim. Proc. 12(i), which states that "rule 26.2 shall apply at a hearing on a motion to suppress evidence." Fed.R.Cim.Proc. 26.2 is virtually identical to the Jencks Act and is designed to incorporate the Act into the criminal rules.

The fact that the tape was destroyed according to "routine" government policy does not immunize the government from the sanctions provided for by the Jencks Act. In *United States v. Harris*, 543 F.2d 1247 (9th Cir.1976), we said that "[w]e reject the contention of the government that the good-faith destruction of [Jencks Act material] in accordance with normal agency procedure is justifiable." *Id.* at 1248. "Whether or not [the agent's] conduct was routine, it was manifestly unreasonable in light of the expressed Congressional intent, and it is no less a violation of the Jencks Act because it was pursued in good faith." *Carrasco*, 537 F.2d at 376.

The government's "routine" destruction of the tape at issue here clearly is unreasonable. It appears from our colloquy at oral argument that preserving the tapes for 90 days would ensure that defendants in cases like Bobadilla–Lopez's would have a sufficient opportunity to make Jencks Act demands. Government policy already requires that the tape be preserved for thirty days—the burden on the government as a result of the requirement that these tapes be preserved for an additional sixty days would be *de minimus*. The Jencks Act does not even *require* that the tapes be made: all that the statute requires is that *if* they are, the government produce them upon receipt of a timely request. Here, the government recklessly destroyed a tape which could have contained material crucial to Bobadilla–Lopez's defense. This reckless conduct resulted in substantial prejudice to Bobadilla–Lopez both during his suppression hearing and trial. The trial court thus erred when it permitted Agent York to testify despite the government's destruction of the tape.

The majority decries the fact that Bobadilla–Lopez's counsel knew that the tape had been destroyed prior to her request for its production. *See* Opinion at 520–21. The defense, however, did not learn that the tape existed until Agent York testified at the suppression hearing, which occurred *after* the tape had been destroyed. The

defense requested production of the tape immediately upon discovering that it had been made: only the government's destruction of the tape—not any delay on the part of the defense—is the cause of the problem we face today. More important, Bobadilla–Lopez's counsel had not only the *right* but the *obligation* to make his request when he learned of the tape's existence, but the government did *not* have a right to destroy the tape at the time it did. Bobadilla–Lopez was entitled to have the tape produced: the government denied him that right.

## VI.

The recent investigation of the practices of the Los Angeles Police Department, as a result of the brutal beating of Rodney King, demonstrates dramatically how peace officers' radio transmissions can be crucial to criminal defendants. The Christopher Commission [16] uncovered a series of recorded radio and digital transmissions among police officers, often in connection with their observations of the activities of alleged suspects at or near the scene of a "crime," which suggested violent and racist motives for the officers' conduct with respect to those individuals. The investigation also revealed that copies of these transmissions were retained, sometimes for a period of years, by the Los Angeles Police Department. The majority opinion would construe the Jencks Act (and, presumably, the Sixth Amendment and the due process clause as well) in a manner that would exempt statements of this nature from production because they (1) would be only "spotty, impressionistic and incomplete" expressions of the officer's motivations and would not constitute a "complete" description of what the officer felt or saw, and (2) would be records of "surveillance activities" instead of records of "witness interviews" and hence not covered by the Jencks Act. I cannot subscribe to such a myopic and hostile view of the vital protections contained in the Act. Because the tape of Agent York's oral radio

---

**16.** Report of the Independent Commission on the Los Angeles Police Department (July 9, 1991).

transmissions to other border patrol agents was Jencks Act material, I would hold that his testimony must be suppressed and the conviction of Bobadilla–Lopez reversed.[17]

17. Because I reach this result, I do not need to address Bobadilla–Lopez's possible due process and Sixth Amendment rights to production of this material.