86 F.3d 901
 96 Cal. Daily Op. Serv. 4336, 96 Daily Journal
D.A.R. 7045
UNITED STATES of America, Plaintiff-Appellee,
v.
Jairo Gilberto ALVAREZ, aka: Jairo Gilberto Cuevas Alvarez;
aka: Jairo Cuevas-Alvarez, Defendant-Appellant.
 No. 94-50187.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 14, 1995.
Decided June 18, 1996.
 
 Yvette M. Palazuelos, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.
 Jose R.E. Batista, Coral Gables, Florida; Donald C. Randolph, Randolph & Levanas, Santa Monica, California; Karyn H. Bucur, Laguna Hills, California, for defendants-appellants.
 Appeal from the United States District Court for the Central District of California, John G. Davies, District Judge, Presiding. D.C. No. CR-92-00458-JGD-4.
 Before FLETCHER, CANBY, and HAWKINS, Circuit Judges.
 OPINION
 FLETCHER, Circuit Judge:
 
 
 1
 Jairo Cuevas Alvarez ("Cuevas") appeals from his judgment of conviction on cocaine trafficking charges. Cuevas contends that the government committed Brady error by failing to produce exculpatory evidence, that the trial court erred by denying his motion for disclosure of tape-recorded surveillance notes pursuant to the Jencks Act, and that the court erred by denying his motion for a new trial based on newly discovered evidence improperly withheld by the government.
 
 
 2
 Although we find that the United States improperly carried out its discovery responsibilities under the Jencks Act and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we conclude that Cuevas was not prejudiced by the United States' actions. We have jurisdiction under 28 U.S.C. § 1291 and affirm.[1]
 
 I.
 
 3
 On June 4, 1992, a federal grand jury returned a 13-count indictment against defendants Cuevas, Yepez, Ortiz, Jose Pinto, Edgar Florez, and Oscar LNU (i.e., last name unknown). All defendants were charged in count one with conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1). Cuevas and Ortiz were charged in count twelve with possession of 935 kilograms of cocaine with intent to distribute it and in count thirteen with distribution of 935 kilograms of cocaine. Oscar was never apprehended. Pinto and Florez pled guilty to count one. Their sentences were affirmed by this court in United States v. Pinto, 48 F.3d 384 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 125, 133 L.Ed.2d 74 (1995).
 
 
 4
 On May 20, 1993, trial of Yepez, Cuevas, and Ortiz began. At trial, the government introduced surveillance testimony of the investigating officers and "expert drug trafficking testimony" consistent with the officers' observations to support its theory that Yepez headed a large-scale, sophisticated cocaine-distribution organization of which Ortiz and Cuevas were members. Anaheim Police Department investigators testified regarding their investigation of defendants from February 1, 1992 to March 12, 1992, during the course of which they seized approximately 1120 kilograms of cocaine.
 
 
 5
 On June 10, 1993, defendants were found guilty on all counts. On March 17, 1994, the district court sentenced Yepez to life imprisonment, Cuevas to 292 months imprisonment, and Ortiz to 235 months imprisonment.
 
 II.
 A. Brady Error
 
 6
 Cuevas contends that the government's untimely disclosure of exculpatory and impeachment evidence relating to the testimony of surveilling officers unduly prejudiced his right to due process under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Alleged Brady violations are reviewed de novo. United States v. Lehman, 792 F.2d 899 (9th Cir.), cert. denied, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986).
 
 
 7
 The United States turned over to the defense final surveillance reports prepared by investigating officers expected to testify. It did not, however, turn over those officers' "rough notes." Yepez filed a pretrial motion, joined by Cuevas, for discovery of rough notes.[2] The United States represented that Anaheim Police Department Investigator Richard Smith had reviewed law enforcement officers' rough notes and found no discrepancies. On the basis of this representation, the district court denied the motion.
 
 
 8
 Several days before trial, the United States turned over a statement by one Enrique Ramirez, the resident of 9010 Burke Street where the 935 kilograms of cocaine Cuevas was alleged to have distributed were allegedly stored, that he had told Smith that no cocaine was stored in his residence. In explaining why she had not disclosed the information sooner, the Assistant United States Attorney (AUSA) said that because Ramirez was obviously lying, the statement was not exculpatory. Upon receipt of this statement, Cuevas renewed his motion for rough notes, contending that the government obviously did not understand its Brady obligation. The district court commented that "government's counsel certainly misunderstood its obligations so far as it pertains to the Ramirez interview with Smith, but that's been cured." The court directed the prosecutor to review all rough notes and disclose anything exculpatory on its face with the Ramirez incident in mind. Two days later the government represented that Investigator Smith had reviewed all the notes, and the court commented that "I don't think Investigator Smith is disqualified from doing that."
 
 
 9
 During trial, Cuevas again asked that rough notes be turned over, contending that Smith didn't understand the government's obligation under Brady. The court denied the motion, but directed the AUSA herself, as opposed to Investigator Smith, to review the notes. On June 1, 1993, halfway through the trial, the prosecutor represented that she had reviewed the rough notes and found three discrepancies. She disclosed copies of Investigator Smith's rough notes of March 11, 1992. Within these notes, Investigator Smith identified the individual who met with Yepez and Herrera on March 11, 1992 during the alleged "dry run" of the distribution of 935 kilograms of cocaine as Oscar LNU, not Cuevas as he had previously stated. On the basis of this failure to disclose, the defense moved for a mistrial or to strike the testimony of Investigator Smith and for the government to turn over all "rough notes." The government offered to recall Investigator Smith. The court denied Cuevas's motions and refused to review the notes, finding that the government had fulfilled its Brady obligation. The government recalled Smith and the defense cross-examined him regarding the discrepancies in his report.
 
 
 10
 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97. Impeachment evidence falls within the Brady rule. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Evidence is material under Brady if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
 
 
 11
 Cuevas does not cite any authority for the proposition that the prosecutor herself, as opposed to an agent, must review all rough notes for Brady information. However, in Kyles v. Whitley, --- U.S. ----, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court emphasized the prosecutor's personal duty to become aware of, and disclose, material exculpatory information. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id. at ----, 115 S.Ct. at 1567. The prosecutor must employ whatever means are necessary to discharge her obligation. The unfortunate series of events in this case makes clear that the better practice is for the prosecutor herself to review such materials.
 
 
 12
 Because the government's failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable, it is particularly important for the prosecutor to ensure that a careful and proper Brady review is done. Delegating the responsibility to a nonattorney police investigator to review his own and other officers' rough notes to determine whether they contain Brady, Bagley, and Giglio information is clearly problematic. Although we have held that the district court cannot order an AUSA personally to review law enforcement personnel files, United States v. Jennings, 960 F.2d 1488 (9th Cir.1992); accord United States v. Herring, 83 F.3d 1120, 1121-22 (9th Cir.1996) (holding that Jennings survives Kyles as the law of the circuit), we see little justification and much danger to both the prosecutor's reputation and the quality of justice her office serves for a prosecutor not to review personally those materials directly related to the investigation and prosecution of the defendants, such as a testifying officer's surveillance notes.
 
 
 13
 We also disagree with the government's position that Ramirez's statement, although facially exculpatory, was nonetheless not subject to disclosure. It is not the role of the prosecutor to decide that facially exculpatory evidence need not be turned over because the prosecutor thinks the information is false. It is "the criminal trial, as distinct from the prosecutor's private deliberations" that is the "chosen forum for ascertaining the truth about criminal accusations." Kyles, --- U.S. at ----, 115 S.Ct. at 1568. To the extent the prosecutor is uncertain about the materiality of a piece of evidence, "the prudent prosecutor will resolve doubtful questions in favor of disclosure." Id. (quoting United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399-2400, 49 L.Ed.2d 342 (1976)); see also id. (The prosecutor is "the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.") (quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).
 
 
 14
 In spite of the government's apparent misunderstanding of its discovery obligations, we conclude that no reversible Brady error occurred. The prosecutor did in fact disclose Ramirez's statement to the defense. The prosecutor also eventually reviewed the officers' rough notes and turned over those notes that contained discrepancies. Although this should have been done earlier, we are confident that Cuevas was not prejudiced by the government's delay. Cuevas was able to cross-examine Investigator Smith fully regarding the discrepancies in his report. Although Cuevas complains that the government was able to examine Smith first about the discrepancy, thereby diffusing its force, the government would have been able to do so anyway even if it had disclosed the information in a timely manner. After the prosecutor finally turned over this material, and Cuevas made no showing that there was additional exculpatory information the government was suppressing, the district court was under no duty to review the surveillance notes in camera. United States v. Michaels, 796 F.2d 1112, 1116 (9th Cir.1986), cert. denied, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987).
 
 B. Tape-Recorded Surveillance Notes
 
 15
 Cuevas contends that the district court committed reversible error under the Jencks Act, 18 U.S.C. § 3500, when it denied discovery of transcribed copies of dictated surveillance notes by Investigator Smith. The district court's denial of discovery pursuant to the Jencks Act is reviewed for abuse of discretion. Michaels, 796 F.2d at 1115.
 
 
 16
 Investigator Smith tape recorded some of his surveillance notes. The tape recorded surveillance notes were typed by a secretary. Smith used these typed surveillance notes to create final reports. The final reports were disclosed to the defense. Cuevas contends that the government was required to turn over the transcripts of the original taped surveillance notes.
 
 
 17
 Under the Jencks Act, the government must turn over pretrial statements made by prosecution witnesses related to the subject matter of their trial testimony. 18 U.S.C. § 3500. This court has held that reports of government agents made in the course of criminal investigation are subject to production under the Jencks Act if the government agent testifies. See, e.g., United States v. Harris, 543 F.2d 1247, 1250 (9th Cir.1976). However, the court has held that an agent's rough notes jotted during surveillance are not producible under the Jencks Act due to the incomplete nature of the notes. United States v. Bernard, 623 F.2d 551, 557-58 (9th Cir.1979). Cuevas contends that because Smith's notes were tape-recorded rather than written, they are subject to disclosure under subsection (e)(2) of the Jencks Act. See 18 U.S.C. § 3500(e)(2) (defining "statement" as, among other things, "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement").
 
 
 18
 Cuevas's argument is foreclosed by United States v. Bobadilla-Lopez, 954 F.2d 519 (9th Cir.1992), cert. denied, 506 U.S. 1056, 113 S.Ct. 987, 122 L.Ed.2d 139 (1993). In Bobadilla-Lopez, we held that a Border Patrol officer's recorded radio transmissions made during surveillance were not discoverable under the Jencks Act:
 
 
 19
 The border patrol agent's radio transmissions share the same rough, incomplete nature as notes hurriedly jotted during surveillance.... [T]he spotty, impressionistic and incomplete on-site transmissions of the agent in this case do not amount to the same kind of narrative 'statement' of a witness producible under the Jencks Act.... [S]urveillance transmissions ... [do] not become 'statements' under section 3500(e)(2) simply because they were recorded.
 
 
 20
 Id. at 522-23.
 
 
 21
 As in Bobadilla-Lopez, Smith's surveillance notes did not become Jencks Act statements simply because they were recorded. The district court did not err in denying Cuevas' motion for disclosure of tape recorded surveillance notes.
 
 C. Motion for a New Trial
 
 22
 Cuevas appeals from the district court's denial of his motion for a new trial on the grounds of newly discovered exculpatory evidence improperly withheld by the government. Specifically, Cuevas contends that the government improperly redacted portions of police reports that it was required to disclose under Brady and the Jencks Act. He also contends that the government lied about not knowing the whereabouts of Jose Herrera, a potential material witness for the defense. The district court's denial of a motion for new trial is reviewed for an abuse of discretion. United States v. Lopez, 803 F.2d 969 (9th Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987).
 
 1. Improper Redactions
 
 23
 After the conclusion of the trial, the defense discovered that the government had surreptitiously redacted portions of police reports it disclosed in pretrial discovery. The defense discovered this because defense counsel happened to receive the same report but unredacted in the course of representing an unrelated defendant in a separate matter.
 
 
 24
 Before trial, the defense sought all surveillance reports under the Jencks Act and Brady. The government admits that it redacted portions of surveillance reports and that "[t]he deletions were not obvious from reviewing the redacted report because the paragraphs in question were 'whited out' to the end of the page" and other paragraphs "had been completely eliminated from the report provided to Cuevas, not simply 'whited out' or 'blacked out.' " In one instance, rather than blacking out certain information, the AUSA directed the investigator to regenerate a second official investigative report omitting that information.
 
 
 25
 The government's actions were entirely improper. Under the Jencks Act, the government did not have a right unilaterally to redact the reports. The Jencks Act provides that the United States shall "produce any statement ... of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). "There are no exceptions to the Jencks rule that all statements relevant to the subject matter of the witness' testimony must be produced...." United States v. Bibbero, 749 F.2d 581, 585 (9th Cir.1984), cert. denied, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985). "The statement need relate only generally to the events and activities testified to by the witness to come within its sweep." Id.
 
 
 26
 Where, as here,
 
 
 27
 the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use.
 
 
 28
 18 U.S.C. § 3500(c) (emphasis added). In other words, if the government believes a portion of a witness statement is irrelevant, the entire statement must be delivered to the court in camera for the court to decide whether a portion of the statement should be redacted. By unilaterally and surreptitiously excising portions of the police reports because the government believed they were irrelevant, the government violated this provision of the Jencks Act. The government appears to think it was entitled to do this so long as the excised material was not exculpatory under Brady, but this is not the case under the Jencks Act.
 
 
 29
 Moreover, the AUSA should not have redacted the reports in such a way that the defense could not tell that material had been redacted. We are shocked that an AUSA would consider it appropriate to instruct an investigator to "redo" an official report to remove paragraphs from that report, creating the misimpression that information is not being withheld. Even if the government had a right to redact certain information from the reports, which it did not, it should have crossed out the redacted material in a way that the defense knew there had been redactions and could, if it wished, challenge the redactions and preserve the record for appeal.
 
 
 30
 We are also troubled by the apparent lack of consistent, well-publicized discovery standards in the Office of the United States Attorney. As we have previously pointed out, "One of the most important responsibilities of the United States Attorney and his senior deputies is ensuring that line attorneys are aware of the special ethical responsibilities of prosecutors, and that they resist the temptation to overreach." United States v. Kojayan, 8 F.3d 1315, 1325 (9th Cir.1993). At oral argument, we inquired of the AUSA (a different individual than the AUSA responsible for the discovery at trial) whether the practice of redacting documents that took place in this case was customary. The AUSA's response was that individual AUSAs utilize different procedures for withholding or providing partially redacted discovery materials. After consulting with her superiors, the AUSA has now informed us that "the procedures utilized in this case were, in fact, aberrational; that they were determined to be improper at the time they were discovered; and that such a practice is neither customary nor sanctioned in this office." The United States Attorney has circulated a memorandum to all AUSAs "reiterating" its disapproval of such a practice. It is unfortunate that such guidance was not provided sooner.
 
 
 31
 Failure to disclose under the Jencks Act is subject to harmless error review. United States v. Ogbuehi, 18 F.3d 807, 811 (9th Cir.1994). Generally, when potential Jencks Act material is not disclosed and the district court did not conduct an in camera review, this court remands so the district court can determine in the first instance whether the statement should have been disclosed under the Jencks Act and whether any error was harmless. Id. Here, the district court reviewed the full, unredacted reports in camera in the context of ruling on Cuevas's motion for a new trial. The court concluded that the redacted information was immaterial, nonexculpatory, unrelated to the subject matter of the witnesses's testimony, and that any error was harmless. We have carefully reviewed the full reports and Cuevas's in camera submission, and we agree. The redacted information involves subsequent surveillance of other individuals and is unrelated to the agents' testimony at trial. Accordingly, the government's failure to follow proper Jencks Act procedures, while unsupportable, does not warrant reversal.
 
 
 32
 2. Suppression of Jose Herrera's Whereabouts
 
 
 33
 Cuevas's second ground for requesting a new trial was his claim that the government possessed information concerning the whereabouts of Jose Herrera (an alleged material defense witness) but failed to disclose it. Jose Herrera is an unindicted coconspirator of Cuevas who was detained briefly by law enforcement authorities on May 20, 1992 and fled before a valid warrant could be obtained. Before trial, defendants moved the district court to order the government to disclose whether Herrera was an informant. Although the government opposed disclosure, the district court ordered it. The government disclosed that Herrera was not an informant in the case and that it had no information concerning the whereabouts of Herrera.
 
 
 34
 In his motion for a new trial, Cuevas claimed that the government lied when it said that Herrera was not an informant and that it did not know of Herrera's whereabouts. In support of this accusation, Cuevas presented his lawyer's and Herrera's cousin's declarations which claimed that Herrera had allegedly been in federal custody in Texas in 1987 under the name "Arcesio Gonzalez." The district court denied the motion.
 
 
 35
 The government declares that it disclosed all information in its possession concerning Herrera. That Herrera might have once been in federal prison under a different name does not establish that he was an informant in this case or that the government lied about knowing his present whereabouts. Accordingly, the district court did not err in denying Cuevas's motion for a new trial.
 
 III.
 
 36
 Because we conclude that the government's discovery errors did not affect Cuevas's right to a fair trial, we affirm. Our affirmance, however, does not lessen our disapproval of the government's actions.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 In an unpublished memorandum disposition filed contemporaneously with this opinion, we affirm the convictions of Cuevas's codefendants Jose Yepez and Miguel Ortiz. United States v. Yepez, Nos. 94-50182, 94-50188, 87 F.3d 1325 (9th Cir.1996)
 
 
 [2]
 Under the Jencks Act, witness statements, including reports prepared by testifying officers, must be turned over to the defense. Although an officer's "rough notes" need not be disclosed pursuant to the Jencks Act as witness statements, United States v. Andersson, 813 F.2d 1450, 1459 (9th Cir.1987), they must be disclosed pursuant to Brady if they contain material and exculpatory information