**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John L. CICCONE, Defendant–
Appellant.**

**No. 98–10483.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 2, 1999.

Filed July 19, 2000.

Douglass A. Mitchell, Dickerson, Dickerson, Consul & Pocker, Las Vegas, Nevada, for the appellant.

Daniel R. Schiess, Assistant United States Attorney (argued), Margaret M. Stanish, Assistant United States Attorney (on brief), Las Vegas, Nevada, for the government.

Before: HUG, Chief Judge, FERGUSON and WARDLAW, Circuit Judges.

FERGUSON, Circuit Judge:

John L. Ciccone appeals his conviction and sentence for one count of conspiracy, 18 U.S.C. § 371, thirty-four counts of wire fraud and aiding and abetting, 18 U.S.C. § 1343 and 2, thirty-six counts of money laundering and aiding and abetting, 18 U.S.C. §§ 1956(a)(1)(A)(I) and 2, and one count of forfeiture, 18 U.S.C. § 982(a)(1). We affirm both his conviction and sentence.

## FACTUAL BACKGROUND

Ciccone was the owner of Feed America Inc. ("Feed America"), a telemarketing company in Las Vegas, Nevada. From March of 1994 until October of 1995, he ran a scheme to defraud people throughout the country. He paid his solicitors a straight commission to telephone people, who had previously relied upon the promises of other telemarketers, and persuade them to send money to Feed America. They succeeded in doing so by telling victims that they had won money, a fabulous prize, and the opportunity to donate to charitable causes. There was one hitch: the lucky victims first had to pay a sizeable sum to Feed America. When people refused, the solicitors called them over and over again. When they did send their money, Feed America returned ten percent of their donation and a cheap gift. Its donations to charitable causes were minuscule.

Ciccone designed a "pitch" for Feed America solicitors to use, which convinced people that they had won an extraordinary prize. It started out like this:

This is (Fundraiser's Name) with FEED AMERICA in Las Vegas, Nevada ... the reason for the call is ... a while back, you had filled out an entry form where you had a chance to win a[sic] award. You signed your name on it and left this phone number to notify you if you had won. Do you recall that? (Response)

Well, you've done much better than that, because you're no longer in competition with anybody else!! The Board of Directors of FEED AMERICA have selected your name for one of the absolute nicest awards[.]

Congratulations!! (Response)

I've always believed that water seeks it's [sic] own level and that great things happen to great people!! You must be a great person because no one is competing against you!!

After effusively congratulating the potential victim for winning a fabulous prize in an apparently fierce competition, the solicitor unveiled the catch:

Well, we ask two simple favors of you ... and I know that you will agree that they are both fair and reasonable.

First, we would like a photo of you with your award so that we can show that real people, like yourself, do receive the nice awards!!

Second, we want you to help us with the national campaign to help feed America. What FEED AMERICA does is feed the homeless of America. . . . How can we help people in other countries when we cannot help ourselves? Isn't it about time we took care of our own people?

. . . .

All we ask is a donation from you in the amount of $___ [1] which guarantees you one of the nicest awards from the Board of Directors of the Organization. (first omission and blank space in original).

As one solicitor testified at Ciccone's trial, this pitch was designed in part "[t]o basically single them out as being special. This is only pertaining to them." Another testified that it gave the impression that victims had "[f]inally hit the jackpot or whatever you want to say." One victim agreed with this assessment, testifying that she was led to believe that Feed America would send "something very, very valuable." Another echoed this perception when she testified, "I was supposed to get top awards for doing good."

In reality, Feed America failed to make good on its promises. The Board of Directors to which solicitors referred did not exist. More important, when Ciccone's victims paid to get their fabulous prize, Feed America sent back ten percent of their money and a cheap gift, like a calendar or a porcelain eagle. The homeless did not fare much better under the deal: evidence showed that of the $2,306,611.56 it received, Feed America gave only $149,286.65 to legitimate charities. The rest, some $2 million, was deposited in Ciccone's personal bank account.

Testimony at trial revealed that Ciccone was involved in the day-to-day operations of Feed America. He hired the solicitors and occasionally supervised them. Every day, he provided the solicitors with "reload lists" showing the names of people to call and how much those on the lists had previously given to telemarketers. These lists were, according to one Feed America solicitor's testimony, the best kind because "they already bought, so chances are they might buy again." In addition, Ciccone purchased the decidedly unremarkable gifts Feed America's solicitors told victims that they had won. As the person in charge of customer service, he also dealt with the steady stream of complaints from donors. In sum, Ciccone was actively involved in the daily operation of Feed America.

A second superseding indictment, dated March 18, 1998, charged Ciccone with conspiracy, wire fraud and aiding and abetting, money laundering and aiding and abetting, and forfeiture. On April 6, 1998, after an eight-day trial, the jury returned a guilty verdict on each count.

On October 23, 1998, the district court sentenced Ciccone to a prison term of 168 months. It made two sets of upward adjustments that Ciccone challenges in this appeal. First, it added six points after finding that Ciccone had laundered $2,235,-135.20. It then added another two points on the ground that the victims were vulnerable because they had previously fallen for telemarketing schemes.

## DISCUSSION

### I. CHALLENGES TO CICCONE'S CONVICTION

Ciccone challenges his conviction on four grounds. First, he argues that the district court erred when it excluded evidence of satisfied donors to buttress his good faith defense. Second, he contends that the government presented insufficient evidence that the scheme to defraud was reasonably calculated to deceive persons of ordinary prudence and comprehension. Third, he asserts that the government presented insufficient evidence of his par-

---

**1.** Several solicitors testified that Ciccone required that they ask for at least $200 but no more than $3,000 at any given time.

ticipation in a conspiracy or scheme to defraud. Finally, he contends that the prosecution violated its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to turn over material evidence. We reject these arguments and affirm his conviction.

A. The District Court's Exclusion of the Evidence of Satisfied Donors Was Not an Abuse of Discretion.

 Ciccone contends that the district court erred when it excluded evidence of satisfied donors and charities to support his good faith defense at trial. To sustain a conviction for fraud and money laundering, the government must prove beyond a reasonable doubt the element of specific intent. *United States v. Sayakhom*, 186 F.3d 928, 941 (9th Cir.1999), *amended by* 197 F.3d 959 (9th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1216, 145 L.Ed.2d 1117 (2000). In an attempt to negate this element, Ciccone proffered evidence of satisfied donors who had sent him letters singing Feed America's praises. Specifically, the donors would have testified that they believed Feed America was a legitimate charitable organization, and that they liked both the gifts and the ten percent cash award Feed America returned to them. Ciccone argued to the district court that these expressions of gratitude kept him in the dark about his business' illegitimate practices. We review evidentiary rulings by the district court for abuse of discretion. *United States v. Leon–Reyes*, 177 F.3d 816, 819 (9th Cir.1999). "We will reverse for abuse of discretion only if such nonconstitutional error more likely than not affected the verdict." *United States v. Ramirez*, 176 F.3d 1179, 1182 (9th Cir.1999) (internal quotation marks omitted).

Ciccone relies on *United States v. Thomas*, 32 F.3d 418, 420–21 (9th Cir. 1994), where we recognized that evidence of the benefits customers received can be relevant to the issue of whether an accused had the requisite specific intent to defraud.

We conclude, however, that this case is distinguishable. Thomas was convicted of fraud for misrepresenting to growers the actual prices that buyers were willing to pay for their fruit. *Id.* at 419. Thomas conceded at trial that he had misrepresented the prices, but he claimed that he did so to even out the market's wild fluctuations and that he had no intent to defraud the growers. *Id.* This would, of course, have negated the offense's specific intent element, which required proof of intent to deprive the victim of money or property. *Id.* In support, Thomas sought to put before the jury evidence showing that the scheme had satisfied growers because they had actually come out ahead by some $175,980. *Id.* The trial court excluded this testimony as irrelevant, although it permitted the government to present the testimony of people who had lost money under Thomas' averaging scheme. *Id.* at 419–20.

We held that, given the nature of both the evidence and the scheme, the district court committed reversible error when it excluded Thomas' evidence of the benefits the growers received. *Id.* at 422. Evidence showing actual gain was highly probative on the issue of the nature of his scheme and whether he had an intent to deprive growers of their property. *Id.* at 420–21. By contrast, Ciccone's proffered evidence would not have shown that donors *actually gained* or that his scheme was beneficial to anyone but Ciccone. Rather, the evidence showed merely that donors *thought* that they had received a benefit. Indeed, there is no indication that the donors Ciccone offered to present to the jury knew, let alone were happy, that the vast majority of their money went straight into Ciccone's bank account rather than to a fund to feed America's homeless. Where, as here, the proffered evidence relates not to the nature of the scheme or the defendant's intent, but rather to the uninformed opinion of the victims, it is not an abuse of discretion to exclude it. *See e.g., United States v. Elliott*, 62 F.3d 1304, 1308 (11th Cir.1996) (upholding exclusion

of evidence of satisfied victims where the proffered evidence would not be probative of intent), *amended by* 82 F.3d 989 (11th Cir.1996); *United States v. Diamond*, 430 F.2d 688, 693 (5th Cir.1970) ("[C]omplimentary letters may very well be an indication that the fraud is succeeding rather than an indicia of good intent. In view of the wide latitude accorded trial courts in the determination of relevancy of evidence we cannot say that there was an abuse of discretion in this instance."). We conclude that the district court's exclusion of this evidence does not require reversal.

B. The Government Was Not Required to Prove that the Scheme Was Reasonably Calculated to Deceive Persons of Ordinary Prudence and Comprehension.

■ Ciccone argues that we must reverse his conviction because the government failed to prove that the scheme to defraud was reasonably calculated to deceive persons of *ordinary* prudence and comprehension. He relies on language in one of our opinions, in which we explained that to prove the existence of a fraudulent scheme, "[t]he government proves specific intent if it proves that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.1980) (internal quotation marks omitted). We have repeated this definition in other cases. *See, e.g., United States v. Mason*, 902 F.2d 1434, 1442 (9th Cir.1990) ("Specific intent is established by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this intention is shown by examining the scheme itself.") (internal quotation marks omitted); *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir.1984) (same).

Although this definition of "specific intent" appears to support Ciccone's contention that the government must prove that the scheme was reasonably calculated to deceive persons of *ordinary* prudence and

comprehension, we have previously rejected this argument. In *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir.1999), the appellant presented the same argument Ciccone does here. *Id.* Specifically, Hanley urged this court to reverse his wire-fraud conviction "because the government failed to prove that they had devised a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* We disagreed, holding that "the law of this circuit does not require such a showing. In this circuit, '[i]t is immaterial whether only the most gullible would have been deceived' by the defendants' scheme." *Id.* (quoting *Lemon v. United States*, 278 F.2d 369, 373 (9th Cir. 1960)) (alteration in original).

Our decision in *Hanley* followed our earlier holding in *Lemon*. There, the appellants argued that they were not guilty of the crime because their scheme could only have deceived the "gullible" and not those of ordinary prudence and comprehension. *Lemon*, 278 F.2d at 373. We held that the offense of which the appellants had been convicted did not require such a showing, reasoning that "the wire-fraud statute 'protects the naive as well as the worldly-wise, and the former are more in need of protection than the latter. As a matter of fact, ... the lack of guile on the part of those solicited may itself point with persuasion to the fraudulent character of the artifice.'" *Hanley*, 190 F.3d at 1023 (quoting *Lemon*, 278 F.2d at 373) (omission in original). Thus, we reject Ciccone's argument that the government had to prove that the scheme was calculated to deceive persons of ordinary prudence and comprehension.

C. The Government Did Not Fail to Prove that Ciccone Participated in a Conspiracy or Scheme to Defraud.

■ Ciccone contends that the government presented insufficient evidence to convict him of wire fraud. To convict a person of wire fraud, the government must prove beyond a reasonable doubt that the

accused (1) participated in a scheme with intent to defraud; and (2) used the wires to further the scheme. *United States v. Bonanno*, 852 F.2d 434, 440 (9th Cir.1988); *see also* 18 U.S.C. § 1343. We have also held that, "[t]o sustain a conviction under the mail and wire fraud statutes, there must be sufficient evidence to show that the defendant willful[ly] participate[d] in a scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *United States v. Lothian*, 976 F.2d 1257, 1267 (9th Cir.1992) (alterations in original) (internal quotation marks omitted). The government can establish knowledge of a fraudulent purpose by circumstantial evidence. *Id.* "We review the sufficiency of the evidence by viewing it in the light most favorable to the prosecution and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Blitz*, 151 F.3d 1002, 1006 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 525 U.S. 1029, 119 S.Ct. 567, 142 L.Ed.2d 473 (1998). We conclude that the government presented sufficient evidence to permit a jury to convict Ciccone of wire fraud.

■ Ciccone concedes that Feed America solicitors defrauded people, but argues that he was not a knowing participant in the scheme. In support, he specifically claims that he did not call the victims. But there is evidence in the record that Ciccone did make some calls himself. For example, one solicitor testified that Ciccone once took the telephone receiver and said:

> Congratulations. I just wanted [to] step in and let you know that you can expect everything. It's all—you know no one else is in competition with you. You know your ship's finally come in. I'm going to turn it back over to [the solicitor]. He'll take down the address and information. And once again, congratulations.

■ But even if Ciccone had not himself made the calls, we have previously held that "[t]he defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." *Lothian*, 976 F.2d at 1262. As owner and president of Feed America, Ciccone provided his solicitors with lists identifying victims of other telemarketing schemes. Some of the people on these lists testified that Feed America solicitors repeatedly called them, even on a single day, to ask them for money. In addition, Ciccone was the author of a sales pitch that was rich with misrepresentations. For example, the claim that potential donors had completed "an entry form where you had a chance to win a[sic] award. You signed your name on it and left this phone number to notify you if you had won" was false. Moreover, the assertions that "you're no longer in competition with anybody else!!" and "no one is competing against you!!" were untrue because there was no competition. The statement that "the Board of Directors of FEED AMERICA have selected your name" was also untrue because there was no such board. Finally, the pitch's claim that "FEED AMERICA ... feed[s] the homeless of America" was hardly true given that over $2 million went into Ciccone's account. We have upheld convictions for fraud in similar cases. *See, e.g., Blitz*, 151 F.3d at 1006 (holding that evidence of personal contact with prospective victims was sufficient to sustain conviction for knowing participation in fraudulent scheme); *Lothian*, 976 F.2d at 1267–68 (concluding that evidence was sufficient to prove fraud where defendant made misrepresentations to customers about company); *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir.1992) (upholding conviction for fraud because appellant knew of complaints from victims about money they were promised, continued to do administrative tasks, and deposited fraudulently acquired checks). We do

so again here because, viewing the evidence in the light most favorable to the government, a rational trier of fact could conclude that Ciccone committed wire fraud.

D. The Government Did Not Violate Its Obligation to Disclose Evidence under *Brady v. Maryland.*

 Ciccone contends that the government unconstitutionally failed to disclose material evidence to the defense. The government violates the Due Process Clause when it fails to disclose material favorable evidence. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* rule applies to both exculpatory and impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375; *see also Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Thus, the Supreme Court has explained that "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 1948 (1999). We must determine whether the evidence was material based on the cumulative impact of all the evidence the government suppressed. *Kyles,* 514 U.S. at 436–38, 115 S.Ct. 1555. We review allegations of *Brady* violations de novo. *United States v. Alvarez,* 86 F.3d 901, 903 (9th Cir.1996).

 Ciccone identifies information about three witnesses which he claims the government unconstitutionally withheld. First, he did not receive information showing the extent to which one of the donors, Happy Van Oder, worked with the FBI. The record shows that the government used Van Oder only to authenticate tapes of conversations she had with Feed America solicitors. Moreover, she admitted before the jury that she had contacted the FBI and offered to assist them in arresting telemarketers. Ciccone suffered no prejudice from the government's failure to disclose this information. We therefore conclude that non-disclosure of this information did not give rise to a *Brady* violation.

Second, Ciccone contends that the government violated the *Brady* rule when it failed to disclose the extent to which Ann Lane, another Feed America victim, worked with the FBI. Like Van Oder, Lane merely authenticated the tapes of conversations she had with Ciccone's facilitators. Moreover, she too admitted to working with the FBI, specifically testifying on direct examination that she had done "contract work for the federal government for the FBI" and that she assisted the FBI's local field office in Knoxville in its efforts to clamp down on telemarketers. Ciccone has failed to show that any prejudice resulted from the government's failure to provide this information, and thus, no *Brady* violation lies here.

 Finally, Ciccone points to the government's failure to disclose the presentence report ("PSR") of one of his co-schemers, William F. Miller. The PSR revealed that Miller had been arrested several times: (1) in 1966, he was arrested for operating an automobile under the influence of alcohol and eventually pled guilty and was fined $50; (2) in 1992, he was released from two years in prison for wire fraud; (3) in 1984, he was arrested for resisting arrest and obstructing a police officer, but no charges were filed; (4) in 1987, he was arrested for defrauding an innkeeper; (5) in 1988, he was cited for driving under suspension; (6) in 1995, he was cited for battery, ex-felon failure to change his address and trespassing. The PSR also notes Miller's history of alcohol use. We are troubled that the government

did not turn over this piece of information to the defense. Nevertheless, we conclude that its failure to do so was not sufficiently prejudicial to warrant a new trial both because the evidence against Ciccone was overwhelming and he vigorously cross-examined Miller. For example, Miller admitted on cross-examination that he had previously been convicted of wire fraud. He also told jurors about his plea agreement with the government, under which he avoided a conspiracy charge and only had to pay $575 in restitution, rather than the full amount Feed America unlawfully took. Miller also admitted to having suffered from alcoholism during the time he worked at Feed America and to having an impaired memory. Weighed as a whole, we conclude that the cumulative impact of the government's failure to disclose the information about the three witnesses does not warrant a new trial.

## II. CHALLENGES TO CICCONE'S SENTENCE

Having rejected Ciccone's arguments for reversing his conviction, we now turn to the two reasons he contends warrant a reversal of his sentence. The district court in this case imposed a 12-point upward adjustment on several grounds. Ciccone challenges only two of these: first, he argues that the district judge erred in making an upward adjustment of two points on the ground that the victims were vulnerable; second, he contends that the judge improperly included in the total amount Feed America took from its victims that amount it paid out in charitable contributions, and in rewards and refunds. We reject both of his arguments and affirm his sentence.

We review a district court's interpretation of the United States Sentencing Guidelines de novo. *United States v. Smith,* 175 F.3d 1147, 1148 (9th Cir.1999). The district court's factual findings in the sentencing phase are reviewed for clear error. *United States v. James,* 139 F.3d 709, 714 (9th Cir.1998).

### A. The District Court Did Not Err When It Concluded that the Victims Were Vulnerable Under § 3A1.1.

■■■ Ciccone argues that the district court improperly concluded that the victims in his case were vulnerable under the United States Sentencing Guidelines. The district court imposed a two-level increase in his offense level, pursuant to § 3A1.1(b) of the Sentencing Guidelines, after determining that "the Government established that the scheme devised by defendant intentionally and purposefully reloaded the most vulnerable victims. And it was the defendant who passed out the names to those who were calling. That is as devised by defendant, once a victim was discovered, that victim was repeatedly targeted for further fraudulent solicitations."

This case falls directly under *United States v. Randall,* 162 F.3d 557, 560 (9th Cir.1998), *cert. denied,* 526 U.S. 1077, 119 S.Ct. 1480, 143 L.Ed.2d 563 (1999). There, we held that victims of a "reloading" scheme, like Ciccone's victims, are vulnerable for purposes of enhancing a convicted person's sentence. We reasoned that, "[t]he enhancement is appropriate when a defendant's activities are directed towards those in need of greater societal protection, thus rendering the defendant's conduct more criminally depraved. The 're-loading' scheme at issue here seeks out people who have a track record of falling for fraudulent schemes." *Id.* (citations omitted).

The district court did not clearly err in finding that Feed America repeatedly targeted victims of other telemarketing schemes. Several solicitors testified that Ciccone gave them lists of people who had previously fallen for telemarketing schemes. One testified that the people on the list "had donated quite a bit and to be quite frank with you weren't what you'd say had a lot of money on hand." Moreover, Feed America's advertisements in one of Las Vegas' daily newspapers specif-

ically sought to recruit "Reloaders"[2] for a company that had the "Best Donor Lists in Country" and was "A RELOAD OFFICE ONLY!" Indeed, victims of Ciccone's scheme testified that Feed America representatives repeatedly called them after they had donated for the first time, promising that they would get even greater awards and prizes if they handed over more money. The district court did not clearly err when it determined that the victims were vulnerable because they were "repeatedly targeted for further fraudulent solicitations."

B. The District Court Did Not Err in Calculating the Amount of Money Feed America Unlawfully Took From Its Victims.

 Ciccone argues that the district court erred in calculating how much he unlawfully took from the victims. He contends that it should have subtracted the amount Feed America returned to its victims in the form of cash awards and cheap trinkets and the paltry amount it gave to charity. Under § 2F1.1 of the Sentencing Guidelines, the amount the person unlawfully took determines the upward adjustment the court makes. We affirm the district court's upward adjustment.

We have previously held that a court need not deduct the cost of refunds and recoveries from the total amount taken where, as here, the services permitted the fraudulent scheme to continue. *Blitz,* 151 F.3d at 1012; *see also United States v. Whatley,* 133 F.3d 601, 606 (8th Cir.1998) (refusing to deduct costs of prizes telemarketers sent to victims from total they unlawfully took), *cert. denied,* 524 U.S. 945, 118 S.Ct. 2357, 141 L.Ed.2d 726 (1998). Such costs were part of the scheme where they "enabled the Telemarketers to continue their scheme for a longer period by staving off detection." *Blitz,* 151 F.3d at 1012. Here, the gifts Ciccone gave to

victims of the scheme helped to preserve Feed America's reputation as a legitimate organization. Indeed, these people truly believed that Feed America was a legitimate organization, even though it was not, which helped Feed America "stav[e] off detection." *Id.* We therefore hold that the district court did not err in refusing to subtract from the total it received the amount Feed America spent on gifts, refunds, and charity.

## CONCLUSION

For the foregoing reasons, we AFFIRM Ciccone's conviction and sentence.

---

**2.** A "reloader" is, according to one witness at Ciccone's trial, "an individual who will call a customer back a second, third, fourth time to

go ahead and resell him." Another solicitor described the term "reloads" as "people that had already been sold before."